**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION**

**CRIMINAL NO.  1:08CR73**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **VS.** | ) | **MEMORANDUM AND** |
| | ) | **O R D E R** |
| **ALEJANDRO FLORES** | ) | |
| **NEREYDA MENDEZ** | ) | |
| _____ | ) | |

        **THIS MATTER** came on for hearing before the Court on August 19,

2008, on Defendant Flores' motion to suppress and a motion to join the

suppression motion by Defendant Mendez.  **Defendant Flores Motion to**

**Suppress, filed July 30, 2008; Defendant Mendez Motion to Join**

**Codefendant's Motion to Suppress, filed July 30, 2008.**  The

Defendants were present with counsel, as was the attorney for the

Government.  An interpreter was provided for Defendant Mendez.  After

review of the parties' briefs, the oral testimony, and the argument of

counsel, the motion to suppress is denied.

## I.  FINDINGS OF FACT

North Carolina Highway Patrol Trooper Ray Herndon was called as the Government's first witness.  Trooper Herndon testified that he has worked with the Highway Patrol for 11 years and is assigned to the Interstate Team, which is part of the Special Operations Criminal Interdiction Unit.  He regularly patrols the area along Interstate 40 ("I-40") from the Tennessee state line east to Asheville, North Carolina.

He testified that on June 10, 2008, around 11 a.m., he was on duty in Haywood County, North Carolina, within the Western District of North Carolina.  While sitting in his vehicle perpendicular to I-40, monitoring eastbound traffic, Trooper Herndon observed a male driving eastbound in a white Bronco truck pulling a two-wheeled trailer.  As the vehicle approached, Trooper Herndon testified he saw the white Bronco, driven by Defendant Flores, brake sharply and travel to the right of the white fog line, nearly colliding with the bridge rail.[1]  Following this near collision, the Bronco re-entered the lane of traffic and traveled past Trooper Herndon at a speed of approximately 60 miles per hour.  He testified he observed

---

[1]Trooper Herndon identified Flores and Mendez as the driver and occupant of the Bronco, respectively, at the hearing.

Defendants Flores and Mendez sitting very fixed and rigid in the front seat, and Flores was tightly grasping the steering wheel and staring straight ahead.  Based on these observations, Trooper Herndon decided to initiate a traffic stop for the lane violation.  After waiting for traffic to clear, he pulled onto eastbound I-40 and pursued the vehicle for approximately two miles.  While in pursuit, he observed the Bronco again veer across the white fog line on the right hand side of the road, travel back into its lane, and then veer across the dotted center line.  By this time, Trooper Herndon testified he had pulled behind the vehicle.  He activated his blue lights and the Bronco with the trailer pulled over and stopped.

As Trooper Herndon approached the Bronco from the passenger side, he noticed the condition of the trailer.  He described the trailer as having a flat bed, with an Arizona license plate, and the tailgate was wired shut.  There was nothing in the trailer except for a well worn spare tire. The white wheel wells of the trailer had greasy smudges and the lug nuts appeared to be very shiny as though they had been worn by having been removed and replaced a number of times.  There was a juvenile female in the back seat along with a small black dog.  When asked for his driver's license, Trooper Herndon testified Flores' hands were shaking badly and it

took him several moments to retrieve the license.  Trooper Herndon observed that Flores appeared as though he were out of breath and he noticed that Flores' pulse was visibly pounding in his neck.  Mendez began searching for the registration and, as she did so, Trooper Herndon noticed her hands were also shaking and a rapid pulse was visible on the side of her neck.  Throughout the traffic stop, Trooper Herndon testified he communicated with Flores in both English and Spanish and that Flores demonstrated no difficulty in either understanding or communicating in English.  Trooper Herndon communicated with Mendez in English as well.

Flores and Mendez eventually produced the license and registration. Trooper Herndon testified that based on his training and experience, the nervousness exhibited by Flores and Mendez was unusual and raised his suspicion that the pair may have been involved in some type of criminal activity.  Trooper Herndon asked Flores to join him at the rear of the Bronco, he asked Flores if he had any weapons on his person and if he could pat him down to confirm that fact.  After confirming Flores possessed no weapon, Trooper Herndon continued to note Flores' continued nervous behavior and he advised Flores to relax.  Trooper Herndon invited Flores to sit in his patrol car so that he could verify his license and registration and

explained to Flores he was going to issue a warning ticket for what he observed to be a lane violation. Trooper Herndon testified that even the knowledge that this was only a warning ticket, Flores still appeared very nervous.

While he filled out the warning ticket, Trooper Herndon questioned Flores about his travel plans. Flores explained that he was traveling from Colorado to North Carolina to help Mendez's uncle move furniture out to Colorado; Flores was unable to provide any specific location of where he was going in North Carolina nor did he know the uncle's name. After issuing the warning ticket, Trooper Herndon testified that he asked Flores if he could talk with Mendez and Flores gave his consent. While Flores remained in the front seat of patrol vehicle, Trooper Herndon returned to the passenger's side of the Bronco and asked Mendez about her travel plans. Mendez stated she and Flores were traveling to North Carolina to move furniture for her cousin, although she could not provide the name of her cousin when asked by the officer. Trooper Herndon noticed Mendez still appeared very nervous. He concluded his conversation and asked her to remain in the Bronco. When he returned to his patrol car, Trooper Herndon discussed some of the inconsistencies in the Defendants' stories

with Flores.  After briefly explaining to Flores that he was suspicious Defendants were engaged in some type of criminal activity, Trooper Herndon asked Flores if there were any weapons or contraband, *i.e.*, illegal drugs, in the Bronco or trailer.  When Flores told him there were none, Trooper Herndon asked Flores if he could search his vehicle and trailer. Flores signed a consent form given to him by Trooper Herndon.  ***See Government Exhibit 1, "Consent to Search" form.***   The form states in part:

> I understand that I have the right to refuse to consent to the search described above, to refuse to sign this form, and to withdraw my consent at any time. I further state that no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me to give my consent to the search described above or to sign this form.

*Id.*  According to Trooper Herndon, the only question Flores asked was whether his Bronco would be damaged during the search. Trooper Herndon replied that the vehicle should not be damaged during the search, but if it were, the Highway Patrol would correct any such damage.  Prior to initiating the search, Trooper Herndon asked Flores who was responsible for the contents of the Bronco and trailer, and Flores replied that he was responsible for everything in the truck and trailer.

After obtaining verbal and written authorization to search the Bronco and trailer, Trooper Herndon called for assistance at the scene so that he could begin his search of the Bronco and trailer. When Trooper Michael Hicks arrived, Trooper Herndon explained his suspicions and that he had obtained consent to search the Bronco and trailer. Flores remained in Trooper Herndon's patrol car and Mendez along with her daughter and the dog exited the Bronco and stood with Trooper Hicks.

Trooper Herndon testified that his search of the Bronco revealed a purse in the floorboard of the front passenger seat containing approximately $2,300 in cash, but nothing else of any significance was found in the car. He also testified that he made note of the fact that there was no luggage in the interior or trunk of the car, leading him to further suspect the Defendants' stories. Observing the trailer, Trooper Herndon testified that it measured approximately 5 x 12 feet and the floor was constructed of thin metal. The axle of the trailer looked abnormally large relative to the small size of the trailer and it appeared the axle was not the original. Trooper Herndon testified that he was able to lie down and look under the trailer and observed several places under the trailer that contained new bolts, some of which were not straight or flush with the axle.

Trooper Herndon testified that he suspected the trailer had been altered by replacing the original axle with a larger one. Based on his training and experience, Trooper Herndon testified that this is a common method employed to conceal contraband.

Trooper Herndon testified that after his inspection of the trailer, he was confident the larger axle tubes contained some type of contraband. Trooper Herndon testified the unexplained nervousness of the Defendants, the discrepancies in Defendants' answers to various details, and the appearance of the trailer, all confirmed his suspicions that contraband was being transported in the trailer's axle.

Trooper Herndon then approached Mendez, who was standing along the passenger side of the Bronco with her daughter and dog, and asked if she would be willing to allow the trailer to be moved to another location for a closer inspection. Trooper Herndon explained to Mendez that he wanted to conduct a closer search for drugs in the trailer and Mendez said that would be fine. Mendez also agreed to communicate Trooper Herndon's request to move the trailer to another location to Flores in Spanish to make sure he understood what was taking place. After speaking with Mendez, Flores agreed to allow Trooper Herndon to move the Bronco and trailer to

the next exit, saying "that was fine, whatever we needed to do." Trooper Herndon testified that Flores then drove the Bronco and trailer a couple of miles to a truck stop at the next exit and he and Trooper Hicks followed. Trooper Herndon testified that Mendez spoke perfect English during his conversations with her that day.

After Trooper Herndon obtained consent from the manager of the truck stop's garage, Flores drove the Bronco and trailer into the garage. Defendants, the juvenile girl and the dog exited the Bronco and Trooper Hicks accompanied them to a nearby convenience store to use the restroom and purchase beverages. Neither Defendant asked any questions nor made any effort to limit the search.

Once the trailer was hoisted on the lift in the truck stop's mechanical bay, Trooper Herndon carefully examined the trailer and confirmed his earlier observations. There were numerous greasy hand prints on the axle and mismatched bolts affixing the axle to the trailer, some old and some new. Trooper Herndon testified that he determined the best way to facilitate the search would be to drill a small hole in the axle. Using a 5/16 inch drill bit, he drilled a hole in the axle and discovered a cylindrical tube housed inside. As he drilled through the inside tube, Trooper Herndon

uncovered a white powdery substance that was field tested and determined to be cocaine.

When Defendants exited the convenience store, they were informed that cocaine was found in the axle and were placed under arrest. A continued search of the axle revealed nine bundles of cocaine that weighed approximately 9 kilograms. [2]

North Carolina Highway Patrolman Michael Hicks also testified at the hearing. Trooper Hicks testified that he has been employed for 15 years with the North Carolina Highway Patrol and also works as a part of the Criminal Interdiction Unit.

Trooper Hicks testified that when he arrived on the scene to assist Trooper Herndon, he observed a man seated in Herndon's patrol car and two persons in the Bronco. He stated that Trooper Herndon shared with him what had transpired, that he suspected the Defendants were involved in criminal activity, and that he had obtained a consent to search the car and trailer. Trooper Hicks further testified that Trooper Herndon asked the

---

[2]The Defendants were stopped around 11 a.m., the consent to search form was completed around 11:25 a.m., *see* Gvt. Ex. 1, *supra*, the search began around 11:26 a.m., and the Bronco and trailer were driven by Flores to the Pilot Truck Stop a few minutes later. Defendants were arrested shortly before noon.

female passengers in the Bronco to exit the vehicle and he stood with them while Trooper Herndon search the vehicle and trailer.  Trooper Hicks testified that the three of them engaged in conversation and that both Mendez and the minor child spoke English extremely well.  Mendez asked Trooper Hicks no questions regarding the search and did not express any objections to the ongoing search.  Trooper Hicks testified that after Trooper Herndon's initial search, he, too, briefly examined the axle and agreed with Trooper Herndon's assessment that the trailer had been taken apart many times and that the axle likely contained contraband.

Trooper Hicks testified he followed Trooper Herndon and the Defendants to the truck stop and waited for them outside the convenience store while they went inside to use the restroom and purchase drinks.  When he was notified *via* mobile phone that contraband had been discovered in the trailer's axle, Trooper Hicks testified that he and another trooper walked with the Defendants back to the garage where they were arrested and placed into handcuffs and shackles.

## II. DISCUSSION

Defendant Flores moves the Court for an order "suppressing any and all evidence obtained as a result of the seizure and search of the defendant and his vehicle" and Defendant Mendez moves to join that motion and argues that all evidence obtained as a result of the June 10, 2008, traffic stop of the vehicle in which she was a passenger should be suppressed.[3] **Defendant's Incorporated Memorandum of Law ("Defendant's Memorandum"), filed July 30, 2008, at 1; Motion to Join, *supra*, at 1.** Defendant Mendez cites *Brendlin v. California*, 127 S. Ct. 2400 (2007), in support of her motion and correctly maintains that *Brendlin* provides passengers with standing to contest the legality of a traffic stop. **Joint Motion, *supra*, at 2.** In deciding the joint motion to suppress, the Court will examine the legality of the stop, the validity of the consent to search, and the scope of the consent to search.

---

[3]Defendant Mendez was originally represented by Raquel Wilson from the Federal Defenders Office. Ms. Wilson filed the motion to join Defendant Flores's motion and was later allowed to withdraw after Jack Stewart entered a notice of general appearance as attorney for Defendant Mendez. Mr. Stewart fully participated in the suppression hearing on the joint motion to suppress. ***See* Order Allowing Motion to Withdraw, filed August 19, 2008.**

## A.    Legality of stop

In contesting the legality of Trooper Herndon's traffic stop, Defendant Flores contends: (1) there was no probable cause to believe that a traffic violation had occurred; and (2) the primary reason for the stop was pretextual based on Defendant Flores' Hispanic descent.  **Defendant's Memorandum, *supra*, at 6-7.**  Defendant Mendez also contests the legality of the stop and maintains that the search of the Bronco and trailer exceeded the scope of Flores' consent.  **Motion to Join, *supra*, at 2**.

The Court finds that Trooper Herndon's decision to initiate a traffic stop was reasonable because it was supported by probable cause.  ***See Whren v. United States*, 517 U.S. 806, 810 (1996) (holding a traffic stop is reasonable "where the police have probable cause to believe that a traffic violation has occurred," or there exists a reasonable suspicion supported by articulable facts that criminal activity may be afoot.)**.  Probable cause exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found[.]" ***Ornelas v. United States*, 517 U.S. 690, 696 (1996)**.

The findings of fact set out herein demonstrate that Trooper Herndon observed Defendant Flores, who was driving the white Bronco, brake sharply, cross the fog line and nearly collide with the bridge rail.  After pulling onto eastbound I-40, Trooper Herndon observed the Bronco again veer across the white fog line of the right hand lane, travel back into its lane, and then veer across the dotted center line before correcting back to its proper lane.  It was at this point that Trooper Herndon activated his blue lights and initiated the traffic stop for the lane violation.  It is of no moment that Defendant Flores was given only a warning ticket.  North Carolina law specifically authorizes law enforcement to issue warning tickets for conduct that could potentially cause harm to the public.  **N.C. Gen. § 20-183(b).**  In considering Trooper Herndon's training and experience and the observations he made while on duty June 10, 2008, and findings of fact herein, the Court concludes as a matter of law that there was probable cause to believe that a violation of North Carolina traffic law had occurred.

Defendant Flores next contends that his Hispanic descent was Trooper Herndon's motivation to initiate the stop.  Trooper Herndon testified that although he could tell Defendant Flores sat rigidly in his seat when he passed by his cruiser on I-40, he did not note any other

observations.  When asked by defense counsel during the suppression hearing whether he could tell if Defendant Flores was Hispanic, Trooper Herndon answered, "No."  There is simply no evidence to support Defendant Flores' contention that this was a pretextual stop based on his Hispanic descent and the argument is without merit.  Accordingly, because the stop was based on probable cause, the motion to suppress any evidence on the basis of the stop is denied.

**B.      Validity of consent**

Defendant Flores contends that the totality of the circumstances surrounding the stop and request for consent to search show that his consent was not freely and voluntarily given.  In support, Flores argues that he does not know how to read the English language on the consent to search form, that he was intimidated by the circumstances surrounding the request to search, and that Trooper Herndon erred in not informing him that he could refuse to give consent to search.  **Defendant's Memorandum,** *supra***, at 7-9.**[4]

_____

[4]Defendant was present with counsel at the suppression hearing and did not testify. Interestingly, Defendant did not have an interpreter present and has made no motion for an interpreter at any time in this case.

In general, the Fourth Amendment prohibits warrantless searches and seizures. ***United States v. Buckner*, 473 F.3d 551, 553 (4th Cir. 2007), *cert. denied*, 127 S. Ct. 2119 (2007)**. However, a search conducted pursuant to valid consent is a well-established exception "to the requirements of both a warrant and probable cause[.]" ***Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citing *Davis v. United States*, 328 U.S. 582, 593-594 (1946)).** When the validity of consent is challenged, the court must determine, based on a totality of the circumstances, whether consent was knowingly and voluntarily given. ***United States v. Mendenhall*, 446 U.S. 544, 557 (1980) (citing *Schneckloth*, *supra*).** "In responding to a defendant's motion to suppress, the Government bears the burden of establishing, by a preponderance of the evidence, that it obtained valid consent to search. ***Buckner, supra*, at 554 (citing *United States v. Block*, 590 F.2d 535, 539 (4th Cir. 1978)).** Based on the findings of facts set out herein, and the relevant case law, the Court concludes that the Government has met their burden to prove that Defendants Flores' and Mendez' consent to search was validly obtained.

Defendant admits that he signed the consent to search form, but claims, through counsel, that he cannot read English. Trooper Herndon made the request to search Defendant Flores' Bronco and trailer while they were seated in the front seat of the patrol car. Trooper Herndon clearly expressed his suspicions that there was contraband in the trailer, and he made the request to search in English, both orally and in writing. Flores' written consent was accompanied by an explanation from Trooper Herndon that by signing the consent to search form, Flores was giving him permission to search the truck and trailer. Trooper Herndon testified he asked Flores if he could search the Bronco and the trailer; the Trooper stated Defendant Flores said , "Yes."

There is no evidence to support Flores' contention that his alleged inability to read in English rendered the search involuntary. The numerous conversations between Trooper Herndon and Flores establish that he could readily understand and respond to Trooper Herndon's questions, and in turn, Flores could readily pose questions of his own. Accordingly, this argument is overruled.

Defendant Flores' contention that his consent was involuntary based on Trooper Herndon's uniform, physical size, or proximity to Flores is

unavailing.  **Defendant's Memorandum,** *supra***, at 7-9**.  The testimony
demonstrates that conversational exchanges between Trooper Herndon
and Flores were never conducted with a menacing or intimidating tone.
The evidence shows that Trooper Herndon and Flores maintained
conversations in both English and Spanish, but the critical conversations
concerning the search were conducted in English.  Trooper Herndon had
no trouble understanding Flores and Flores' responses indicate that he
understood and was willing to comply with each of Trooper Herndon's
requests.  Upon request, Flores provided his driver's license, he
accompanied Trooper Herndon to the rear of the vehicle and to the patrol
car, and he willingly provided verbal and written consent to search the
Bronco and trailer.  Based on the foregoing, this argument is overruled.

Defendant Flores' contends that it "appears from the trooper's
recitation of the facts that he did not verbally inform the defendant of his
right to refuse consent, or that he was free to leave." **Defendant's
Memorandum,** *supra***, at 7.**  While a defendant's knowledge of his right to
refuse to consent to a search is relevant to the inquiry, "the Government
need not demonstrate that the defendant knew of his right to refuse
consent to prove that the consent was voluntary."  ***United States v.***

***Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996) (citing *Schneckloth*, 412 U.S. at 248-49).** Even assuming Defendant Flores could not read English, which this Court does not find as fact, the surrounding facts and circumstances establish that Defendant Flores freely, knowingly, and rather agreeably, granted consent to Trooper Herndon to search the Bronco and trailer during the traffic stop. Further, the Court finds that Flores knowingly and voluntarily consented to Trooper Herndon's request to move the Bronco and trailer to another location so that the search could continue. Trooper Herndon and Mendez explained to Flores what Trooper Herndon's suspicions were regarding the presence of contraband within the vehicle and Flores voluntarily drove the Bronco and trailer to the truck stop with the express understanding that the search would continue.

Defendant Mendez knowingly and voluntarily consented to the search of the Bronco and trailer. After explaining in detail that he believed there might be contraband concealed in the trailer, Trooper Herndon asked Mendez if she would allow him to move the trailer to a place for closer inspection. Trooper Herndon testified that she replied, "that would be acceptable" and "that would be fine."

**C.    Scope of Consent**

Defendants next contend Trooper Herndon exceeded the scope of

Flores' consent when he drilled a small hole in the axle of the trailer.

**Defendant's Memorandum,** *supra*, **at 12-13.**[5]  "The touchstone of the

Fourth Amendment is reasonableness**."** *Florida v. Jimeno*, **500 U.S. 248,**

**250 (1991) (citing** *Katz v. United States*, **389 U.S. 347, 360 (1967)).**

In *Jimeno*, the Court reasoned that "we have long approved consensual

searches because it is no doubt reasonable for the police to conduct a

search once they have been permitted to do so." *Id.* **at 250-51.** "The

standard for measuring the scope of a suspect's consent under the Fourth

Amendment is that of 'objective' reasonableness – what would the typical

reasonable person have understood by the exchange between the officer

and the suspect?" *Id.* **at 251 (citing** *Illinois v. Rodriguez*, **497 U.S. 177,**

**183-89 (1990));** *see also United States v. Ross*, **456 U.S. 798 (1982)**

**(finding that the scope of a search is defined by the expressed object**

**of the search).**

---

[5]The Court has concluded as a matter of law that there was probable cause to initiate the traffic stop and that Defendants consented to a search of the Bronco and trailer. Further, the Court has concluded that Defendants knowingly and voluntarily consented to moving the Bronco and trailer to another location to continue the search of the trailer.

The facts in the present case establish that Trooper Herndon explained to both Defendants his suspicions that there was contraband concealed within the axle of the trailer.  Defendant Flores, after denying there was any contraband in either the Bronco or the trailer, expressly claimed that he was responsible for the entirety of the contents of both the Bronco and trailer.  Defendants then each consented to the search of the Bronco and trailer, both on the roadside and at the truck stop.  Thus, the expressed object of Trooper Herndon's search was contraband he believed was housed in the axle of the trailer and he testified that based on his training and experience, contraband is often concealed in such a manner within a hollow axle.  A reasonable person, therefore, would have understood that Trooper Herndon was asking for consent to search the entire trailer and, in order to do so, he would have to be able to look inside parts of the trailer, namely the axle.  While it is true that Defendant Flores asked if the trailer would be damaged, Trooper Herndon replied that it should not be damaged, but that if it were, the North Carolina Highway Patrol would take care of any such damage.  With this disclaimer in hand, Defendant Flores voiced no objection to the continued search of the axle and in fact drove the Bronco and trailer into the garage so that the search

could continue.  Defendant Flores contends that drilling a small hole in the axle exceeded the scope of his consent.  **Defendant's Memorandum, *supra*, at 12 (citing *United States v. Strickland*, 902 F.2d 937 (11th Cir. 1990).**  In *Strickland*, an officer obtained consent to search from a driver during a traffic stop.  The officer noted that after moving a spare tire there appeared to be a package concealed within.  In an effort to determine whether there was contraband, the officer slashed the spare time, and did indeed locate narcotics within the tire.  The Eleventh Circuit found that destruction of the tire exceeded the reasonable scope of the defendant's consent to search, but did not suppress the search because the court concluded the officer had probable cause at that point to search the tire without the defendant's consent.  *Id*. **at 941.**  Defendant Flores relies on language in *Strickland* that concludes a person that has given consent to search "does not anticipate that the search will involve the destruction of his vehicle, its parts, or contents." *Id*. **at 942.**

In the present case, the Court concludes that drilling a small hole in the axle, after first clearly obtaining knowing and voluntary consent to search the trailer, was a reasonable method of carrying out the search. The only likely alternative to drilling a small hole would have been to

dismantle the axle and this would have only served to unnecessarily prolong the search.

However, the Court having considered the facts as found herein, also finds that Trooper Herndon, based on his training and experience, had developed probable cause to search the axle. Troopers Herndon and Hicks both testified that it was evident from their inspection of the trailer that the lug nuts had been removed a number of times and that the axle appeared far too large for the trailer. Further, Trooper Herndon testified that hollow axles are often used to conceal contraband. **See *United States v. Price*, 869 F.2d 801, 804 (5ᵗʰ Cir. 1989) (finding that the presence of a secret compartment supported probable cause to search); *see also United States v. Martel-Martines*, 988 F.2d 855 (8ᵗʰ Cir. 1993) (concluding same).**

Based on the foregoing, the Court concludes that Trooper Herndon did not exceed the scope of Defendant Flores' consent. Alternatively, the Court concludes Trooper Herndon had probable cause to search the axle and that he employed the least invasive method to carry out his search.

### III.  ORDER

**IT IS, THEREFORE, ORDERED** that the motion of Defendant Mendez to join the motion to suppress filed by Defendant Flores is **ALLOWED**.

**IT IS FURTHER ORDERED** that Defendant Flores' motion to suppress, joined by co-Defendant Mendez, is hereby **DENIED**.

Signed: August 25, 2008

Lacy H. Thornburg
United States District Judge